The STATE ex rel. BRUCE

v.

STATE TEACHERS RETIREMENT BOARD OF OHIO.

[Cite as *State ex rel. Bruce v. State Teachers Retirement Bd. of Ohio,* 153 Ohio App.3d 589, 2003-Ohio-4181.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–1059.

Decided Aug. 7, 2003.

590

Manos, Martin, Pergram & Dietz Co., L.P.A., and James M. Dietz, for relator.

Jim Petro, Attorney General, and John E. Patterson, Assistant Attorney General, for respondent.

---

DESHLER, Judge.

{¶ 1} Relator, Deborah S. Bruce, has brought this original action seeking a writ of mandamus ordering respondent, State Teachers Retirement Board of Ohio ("STRB"), to vacate its decision denying her application for disability retirement benefits and to enter a decision granting her application.

{¶ 2} Pursuant to Civ.R. 53(C) and Local R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court who examined the evidence and issued a decision, including findings of fact and conclusions of law. The magistrate rendered a decision recommending that this court grant a limited writ of mandamus, ordering respondent STRB to vacate·its decision denying relator's application for disability retirement and to reconsider the evidence as outlined in the magistrate's decision and enter a new decision that either grants or denies relator's application. (Attached as Appendix A.) Both relator and respondent have filed objections to the magistrate's decision. The matter is now before this court for independent review.

{¶ 3} Respondent's objections assert that the magistrate, in concluding that respondent must vacate its decision denying disability and reconsider the matter, inappropriately chose to reweigh the medical evidence relied upon by STRB in reaching its decision, rather than considering the matter under an abuse-of-discretion standard. The pertinent part of the magistrate's decision is that which found an abuse of discretion with respect to STRB's consideration of a report by Dr. John A. Larry, to whom relator was referred by STRB for examination to determine relator's cardiac situation. Dr. Larry's report opined that relator was disabled due to a combination of chronic-fatigue syndrome and frequent episodes of syncope, caused by abnormal venous pooling and postural orthostatic tachycardia syndrome. Dr. Larry concluded that "[d]ue to the combination of these two illnesses, it seems unlikely she is able to teach in a classroom for an eight hour day."

{¶ 4} The magistrate noted that STRB emphasized the eight-hour-day criterion cited in Dr. Larry's report and explained in its decision that the report could not be taken to establish that relator was incapable of part-time work, which was typical of her service prior to ceasing work. The magistrate's conclusion was that the STRB decision constituted an abuse of discretion because it rewrote Dr. Larry's disability opinion to give it significance and effect that was beyond the

scope of the report, particularly because there was no indication that Dr. Larry had been asked to opine upon relator's ability to work a less than eight-hour day. Since STRB stated its intent to consider Dr. Larry's report, the magistrate concluded that STRB either misconstrued the report or, if it intended not to rely on the report at all, failed to obtain the additional cardiac examination that it had earlier determined to be necessary. The magistrate concluded that STRB could not, without a more fully developed explanation on the record, determine that a review of relator's disability application required the appointment of an independent examiner to ascertain relator's cardiac status, then either misconstrue that report or reject it and rely solely upon prior medical evidence previously found to be incomplete.

{¶ 5} Respondent's objections to the magistrate's decision assert that the magistrate erroneously found that STRB should be bound by the recommendation of Dr. Larry, rather than considering the medical record as a whole. Respondent asserts that it is the statutory duty of STRB to weigh the medical evidence and that the magistrate should not reweigh that evidence when reviewing the matter.

{¶ 6} We find these objections to be without merit. The magistrate's decision clearly explains its rationale and does not constitute a reweighing of the evidence but, rather, concludes that STRB, once it had found that additional cardiac assessment of relator was necessary, could not entirely reject that subsequent cardiac assessment or interpret it in a manner directly contrary to its plain wording. This does not constitute a reweighing of the evidence but, rather, a proper review of whether STRB abused its discretion in reaching its conclusion that relator was not entitled to a disability claim. Respondent's objections are accordingly overruled.

{¶ 7} Relator's objections to the magistrate's report submit the converse proposition to that presented by respondent. Relator asserts that the magistrate should, based upon the evidence before STRB, recommend issuance of a writ of mandamus instructing respondent to enter a new decision granting disability retirement to relator. We find that relator's objections in fact invite us to weigh the evidence in the impermissible manner objected to by respondent. "Where the evidence before the Board is conflicting, a court cannot substitute its judgment for that of the decision-making body and find an abuse of discretion." *State ex rel. Ruby v. State Teachers Retirement Sys.* (Dec. 6, 1989), Summit App. No. 13844, 1989 WL 147983; see, also, *State ex rel. McMaster v. School Emp. Retirement Sys.* (1994), 69 Ohio St.3d 130, 630 N.E.2d 701. The magistrate's conclusion was not that the evidence could only be weighed so as to give an outcome favorable to relator, but that the STRB, in assessing the evidence before it, must do so consistently with its prior determinations when reviewing conflict-

ing evidence. The present posture of this case does not call for us to substitute our judgment for that of STRB in resolving these conflicts. Relator's objections to the magistrate's report are accordingly overruled.

{¶ 8} In summary, following an independent review of the record pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the relevant law thereto. We therefore adopt the magistrate's decision as our own, including the findings of fact and conclusions of law therein. In accordance with the magistrate's decision, having overruled both relator's and respondent's objections, a limited writ of mandamus will issue ordering respondent to vacate its decision denying relator's application for disability retirement, and, in a manner consistent with this decision and the magistrate's decision, enter a new decision that either grants or denies relator's application.

Objections overruled
and limited writ granted.

BOWMAN and KLATT, JJ., concur.

DANA A. DESHLER, JR., J., retired, of the Tenth District Court of Appeals, sitting by assignment.

### APPENDIX A

### MAGISTRATE'S DECISION

Rendered on March 31, 2003

### IN MANDAMUS

{¶ 9} In this original action, relator, Deborah S. Bruce, requests a writ of mandamus ordering respondent, State Teachers Retirement Board of Ohio ("STRB"), to vacate its decision denying her application for disability retirement benefits and to enter a decision granting her application.

Findings of Fact:

{¶ 10} 1. On January 6, 2000, relator, who is a member of the State Teachers Retirement System of Ohio ("STRS"), filed with STRS a disability retirement application. Relator had been employed as a high school English teacher with the Stow–Munroe Falls City Schools.

{¶ 11} 2. STRS's application form asks the applicant to describe the nature of his/her physical/mental disability that incapacitates for the performance of duty as a teacher. In response to the query, relator wrote: "See Attached Statements."

{¶ 12} 3. On December 23, 1999, relator's attending physician, Catherine Y. Taras, M.D., completed an STRS form captioned "Report of Attending Physi-

cian." The STRS form asks the attending physician to state the diagnosis. Dr. Taras wrote: "Chronic Fatigue Syndrome; Fibromyalgia." The form asks the attending physician to give a "general summary of applicant's physical condition." In response, Dr. Taras wrote: "Excessive fatigue with activity is major problem. She is very fatigued with daily activity such as walking and housework."

{¶ 13} The STRS form asks the attending physician to give a "general summary of applicant's mental condition." In response, Dr. Taras wrote: "Pt [patient] was *not* found to have anxiety or depression." (Emphasis sic.)

{¶ 14} The STRS form also asks the attending physician for his/her recommendation. Dr. Taras certified that relator is incapacitated for the performance of duty as a teacher and that the disability is considered to be permanent.

{¶ 15} 4. Dr. Taras's December 23, 1999 "Report of Attending Physician" was attached to relator's application filed on January 6, 2000. Relator also attached copies of Dr. Taras's office notes regarding relator's office visits during the years 1998 and 1999.

{¶ 16} 5. Also attached to the application was a two-page typewritten narrative report dated December 5, 1999 from Leonard H. Calabrese, D.O., Vice Chairman, Department of Rheumatic and Immunologic Disease at the Cleveland Clinic Foundation. Dr. Calabrese's December 5, 1999 report to Dr. Taras states:

{¶ 17} "I saw your patient, Deborah Bruce, for lengthy evaluation of her complex medical problems here at the Cleveland Clinic on October 28 * * *. At this juncture, I find no evidence that this represents lupus or a related connective tissue disease and believe strongly that this represents chronic fatigue syndrome complicated by fibromyalgia. She meets current CDC criteria for this and virtually all of her signs and symptoms can be accordingly explained.

{¶ 18} "Laboratory studies at this time again reveal her to be ANA negative. Normal acute phase reactants, normal muscle enzymes and normal screening chemistries.

{¶ 19} "* * *

{¶ 20} "As you are aware, there is not [a] 'quick fix' for this condition, but we have been impressed with the controlled studies demonstrating a benefit for graded low intensity exercise. I have also given her some suggestions on her nutrition as to how to strive towards a more ideal body weight by maintaining a diet low in saturated fats. Lastly, I discussed some of the negative factors affecting her at the present time including fractured sleep and diminished coping skills. Though she is a remarkably positive woman, I think in certain ways she had hit her limits in trying to figure out and deal with this complex array of

physical symptoms. Accordingly, I have placed her on Effexor 75 mg XR as an adjunct."

{¶ 21} 6. The STRS disability retirement application asks the applicant to attach to the application a copy of the applicant's most recent job description. Relator's attached job description indicates that, during academic year 1996–1997, she was an "English/Journalism Instructor" who "taught 5–6 classes per day." She was also "Director" of the "Interdisciplinary Writing Center" and the advisor to the high school news magazine "Stohion." As advisor to the Stohion she managed a staff of 30 students who published ten issues per year. The "job description" also indicates that relator was on "medical/maternity" leave during the 1997–1998 academic year and she was on maternity leave during the 1998–1999 academic year.

{¶ 22} 7. On March 7, 2000, the superintendent of Stow–Munroe Falls City Schools completed an STRS "Disability Report" form. The form asks that the superintendent describe relator's job duties. The superintendent wrote:

{¶ 23} "Deborah was, in different years, a half-time and a full-time [E]nglish teacher at our high school. This included all responsibilities associated with instruction: planning, procurring [sic] materials, classroom management, assessment, grading, conferencing, etc."

{¶ 24} In response to another query, the superintendent wrote:

{¶ 25} "Deborah worked half-time in 1994–95; full-time for 125 days in 1995–96; full-time in 1996–97 and was on parental leave during 1997–98 and 1998–99. She resigned at the end of the 1998–99 school year."

{¶ 26} 8. Relator's disability retirement application prompted STRS to have relator examined by Claire V. Wolfe, M.D., who apparently specializes in physical medicine and rehabilitation. Dr. Wolfe issued a report, dated March 14, 2000, stating:

{¶ 27} "Apparently, Deborah has had signs of chronic fatigue since 1991 when she was tested for thyroid disorder. Her symptoms increased in 1994–1995 and she became much worse in 1997. She states that in that year the fibromyalgia kicked in and became very disabling with pain and weakness. She was exhausted for days. She found that she would easily forget her sister's telephone number.

{¶ 28} "Deborah had a diagnosis of antiphospholipid disorder, which was one of the reasons she apparently had so much difficulty with her pregnancies. Apparently, her sister has the same diagnosis. It was, therefore, felt that she may well have a collagen disease. However, she has had an extensive workup for that and, as STRS knows from the information they sent me, Dr. Leonard Calabrese at the Cleveland Clinic does not believe she has lupus or any other collagen disease

abnormalities. Deborah has joined a fibromyalgia water aerobics class to which she goes three time a week for 45 minutes at a time and that seems to have helped. She has also started on ibuprofen 600 mg and she notes that that gives significant relief within 15 to 30 minutes. She usually takes it three times a day. Dr. Calabrese started her on Effexor 75 mg. That has helped with her fatigue during the day so she no longer has to nap, but she is still waking multiple times a night, usually to urinate. She states she might be up 10 to 15 times a night. She is also awakened at night with muscle spasms. Some days, the pain becomes unbearable as does the fatigue and she notes joint pain even while lying in bed. * * *

{¶ 29} "* * *

{¶ 30} "Impression

{¶ 31} "Fibromyalgia.

{¶ 32} "Recommendations

{¶ 33} "I do not believe that Mrs. Bruce's fibromyalgia is disabling for her job as an English and journalism teacher. I think she would have significantly less fatigue if she would sleep at night. No one has tried her on any of the tricyclic medications in the evenings that might allow her to sleep and would certainly decrease the frequency of her urinating."

{¶ 34} 9. Dr. Wolfe's March 14, 2000 report, along with relator's application and supporting medical records, were forwarded to the STRS medical review board which is a panel of three physicians that advises the STRS disability committee and the STRB on all medical issues. Each member of the medical review board evaluated relator's application and Dr. Wolfe's report. Each member filed a separate written report recommending that relator's disability application be denied.

{¶ 35} 10. On May 16, 2000, the chairman of the medical review board recommended to STRS that the disability retirement application be denied.

{¶ 36} 11. Thereafter, relator submitted another report from Dr. Calabrese dated September 11, 2000, stating:

{¶ 37} "* * * I do not believe that at the present time Deborah Bruce is capable of gainful employment. She is incapacitated by pain, fatigue, and neurocognitive disturbances. Unfortunately, all of these are subjective and impossible to document. On our modified disability scale, Deborah ranks between 20 and 30% which means moderate to severe symptoms at rest, severe symptoms with any exercise, overall activity reduced to 50% of expected, usually confined to house, unable to perform any strenuous tasks, unable to concentrate

for more than one hour a day.    Patients with this level of disability are generally totally disabled.

{¶ 38} "At the time of her last visit, I recommended that she obtain a psychiatry evaluation which is essential in patients with chronic fatigue syndrome and/or fibromyalgia who are considering total disability.    This is in the process of being set up.

{¶ 39} "For the record, I am generally totally against disability in this setting. Less than 5% of my patients with these disorders are completely and totally disabled.    Given the fact that Deborah Bruce's symptoms are so severe and chronic and have been refractory to empiric antidepressants, exercise and modified cognitive behavioral therapy, I think her prognosis is poor for returning to the work force."

{¶ 40} 12.    Relator requested and obtained an evaluation from psychiatrist Jeffrey C. Hutzler, M.D., who is with the Cleveland Clinic Foundation.    Dr. Hutzler performed his evaluation on September 18, 2000.    Dr. Hutzler reported:

{¶ 41} "CHIEF COMPLAINT: Mrs. Bruce came to my office on September 18, 2000 with a chief complaint of 'The fatigue and pain in my joints, hips, feet, and back are daily.    I have a skin condition on my feet so that they hurt.    Some days are better than others'.

{¶ 42} "* * *

{¶ 43} "MENTAL STATUS EXAMINATION: The hallmark of Mrs. Bruce's evaluation was her calm and pleasant demeanor, a little bit 'people pleasing' but otherwise perfectly normal.    She occasionally did have some difficulty getting out a sentence, which was fairly complex, but otherwise had no cognitive slippage. She is sleeping better on Effexor and tries to get about 8 hours of sleep per night.    She wakes about 3–4 times a night, although before going on Effexor she woke much more frequently than that.

{¶ 44} "She denies crying spells.    She admits to severe fatigue, muscle pain and spasms.    She does not have all-pervasive sadness, does not have anhedonia and, in fact, is able to derive a good deal of joy from her life.    She feels sad when she has a lot of pain but otherwise does not feel sad.    She describes her ability to enjoy life as 'sitting on a bench, going for a drive in the car, or working on my computer.    I like music and reading to my daughter.    I love to cook a meal and sit with my husband to enjoy it'.    She denies suicidal ideation, anxiety, or panic disorder symptoms.    She denied Obsessive/-Compulsive Disorder symptoms. Her memory and concentration are poor as documented during the mental status examination.    Her appetite is good and she has lost weight in the past year purposely.    Sex is of interest to her when she is not very sore or in pain, but otherwise, it is 'off and on'.

{¶ 45} "She concluded her interview by saying 'I think I have done psychologically very well'. She said that she was able to set limits and care for herself, the goal of her psychotherapy. She also goes to massotherapy and gets I.V. nutrition, all paid for by her.

{¶ 46} "DIAGNOSIS:

{¶ 47} "• Axis I: Psychological Factors Affecting a Physical Illness (fibromyalgis, chronic fatigue syndrome)

{¶ 48} "• Axis II: Deferred

{¶ 49} "• Axis III: Fibromyalgis and Chronic Fatigue, and Inflammation of her feet.

{¶ 50} "• Axis IV: Moderately severe stress of her physical illness.

{¶ 51} "• Axis V: GAF = 50–60.

{¶ 52} "SUMMARY AND RECOMMENDATIONS: After reviewing Mrs. Bruce's psychological history, it is my opinion that she is getting excellent treatment, is appropriately taking Effexor, and I can think of no other additional medication which would be of help to her. I encouraged her to continue in psychotherapy, which clearly has benefited her. I think she has actually made a quite good adjustment to a disabling illness. I would agree that *from a global medical standpoint she is disabled in her ability to teach.*" (Emphasis sic.)

{¶ 53} Dr. Hutzler's report was forwarded to STRS in further support of relator's application.

{¶ 54} 13. On October 12, 2000, Dr. Wolfe, at STRS's request, reviewed Dr. Calabrese's September 11, 2000 report. Dr. Wolfe wrote:

{¶ 55} "* * * Dr. Calabrese notes that he is 'generally totally against disability in this setting.' In fact, the recent literature on fibromyalgia within the last two years has shown that most of the national experts, including Doctors Wolfe and Bennett, have reversed their thinking on disability for people with fibromyalgia and now feel that it is in fact more harmful to them than helpful. There is, in my opinion and that of others, no functional or anatomic basis for disability in these individuals."

{¶ 56} 14. On November 30, 2000, the STRS disability committee was scheduled to vote on the recommendation of the medical review board. However, the disability committee decided to continue its meeting so that additional information could be submitted and evaluated.

{¶ 57} 15. Following receipt of the additional information, STRS asked Dr. Wolfe to review it. On January 18, 2001, Dr. Wolfe wrote:

{¶ 58} "* * * Your current information, which I have reviewed, includes a physical exam/functional capacity evaluation from Akron General Medical Center of November 27, 2000. The patient got dizzy the first day of testing and never returned for additional testing. Her inability to perform most of the activities which she was requested to do prior to getting dizzy is consistent in individuals with fibromyalgia who perceive weakness and pain with such activities. In fact, there is good documentation in the literature that individuals who have myofascial pain syndromes have more subjective complaints and inability to do functional activities on a subjective perceptual basis.

{¶ 59} "Also included in your packet to me were some laboratory tests from November 27, 2000. There were a few scattered elevated tests but nothing consistent that would indicate any significant metabolic problems. * * *"

{¶ 60} 16. On March 2, 2001, the disability committee voted unanimously to deny relator's application.

{¶ 61} 17. On March 26, 2001, the STRB voted to deny relator's application.

{¶ 62} 18. Relator timely requested an appeal hearing pursuant to R.C. 3307.62.

{¶ 63} 19. In the meantime, in January 2001, relator was evaluated by Fetnar M. Fouad–Tarazi, M.D., of the cardiology department of the Cleveland Clinic Foundation. Dr. Fouad–Tarazi issued a report dated January 18, 2001.

{¶ 64} 20. On August 17, 2001, Dr. Calabrese wrote:

{¶ 65} "I have cared for Deborah Bruce since October 1999. Mrs. Bruce has a highly complex illness characterized by numerous symptoms, largely subjective and at times confusing, but predominantly those of pain, fatigue, and neurocognitive disturbances. Her working diagnosis is chronic fatigue syndrome as defined by the Center for Disease Control complicated by neurogenic hypotension as documented by tilt test assay and psychologic factors affecting her physical condition.

{¶ 66} "Her treatment program has consisted of modified cognitive behavioral therapy, exercise, nutrition, and the antidepressant, Effexor. Although Mrs. Bruce has been very compliant, she continues to suffer symptoms which preclude her from gainful employment, including a return to teaching. She has been evaluated by Dr. Jeffrey Hutzler, a psychiatrist at the Cleveland Clinic, he has concluded that she is getting excellent treatment and is on proper therapy. He has encouraged Mrs. Bruce to continue psychotherapy and agreed in a global medical position that she is disabled from her ability to teach.

{¶ 67} "Recently Mrs. Bruce underwent cardiac evaluation because of her current syncopal episodes and was found to have a diagnosis of postural orthos-

tatic tachycardia syndrome and neurocardiagenic syncope. She has been prescribed beta-blockers and participation in a cardiac rehab program.

{¶ 68} "Generally most patients with fibromyalgia and/or chronic fatigue syndrome are encouraged to maintain their place in the work force and disability is kept to a last resort. There are, however, as with many medical conditions exceptions to the general rule. Mrs. Bruce is a clear exemption to this rule and has not only the subjective symptoms of pain, fatigue, and neurocognitive dysfunction, but also the objective assessment of neurogenic hypotension and syncopal episodes which have interfered with her rehabilitation. At times, while patients with this disorder are functioning within a normal range, these periods occur unpredictably and therefore are unable to be accommodated for in a work place setting.

{¶ 69} "A report by Dr. Wolf[e] did not have the advantage of a cardiac test and she concluded quite properly that Mrs. Bruce's symptoms are largely subjective. This is the nature of these illnesses and only after long and careful follow-up and repeated assessments from both the physical and the psychologic perspective can the reliability in these symptoms be accepted. Such is the case of Mrs. Bruce. Mrs. Bruce's cardiac symptoms complicate her overall medical condition, particularly from the perspective of continuing successful rehab program. Even given rehabilitation on a regular basis, her prognosis is highly guarded given the gravity and chronicity of her symptoms. The relationship between neurogenic hypotension and chronic fatigue syndrome and fibromyalgia is highly complex. There is growing medical literature on this suggesting that these symptoms may or may not be related to neurogenic hypotension but no doubt that neurogenic hypotension is more frequently seen in the [sic] this than in control patients. In my opinion, Mrs. Bruce has been thoroughly evaluated by no less than 3 separate specialists at the Cleveland Clinic, all concluding that she is incapable of performing her teaching duties. While we all wish better for our patients, Mrs. Bruce represents the unusual case where her symptoms disable her from an employment perspective. To deny her disability because of the diagnosis of fibromyalgia and/or chronic fatigue syndrome fails to recognize the full scope of her medical condition. Dr. Hutzler put it best when he referred to a 'global' perspective in concluding that Mrs. Bruce was unable to teach. * * *"

{¶ 70} 21. At the September 21, 2001 appeal hearing, the STRB decided that an additional medical evaluation was needed "to clarify her cardiac status." Consequently, relator was scheduled for an examination to be performed by John A. Larry, M.D., who is a clinical assistant professor of internal medicine.

{¶ 71} 22. In the meantime, by letter dated October 30, 2001, relator's counsel advised STRS as follows:

{¶ 72} "Secondly, during our appeal presentation, Mrs. Bruce indicated her concern that the Retirement System had failed to adequately evaluate her disabling condition, specifically with reference to chronic fatigue syndrome. The only physician to have previously evaluated Mrs. Bruce was Dr. Claire Wolf[e] who, by her own reports has never evaluated her for this condition. In her initial report of March 14, Dr. Wolf[e] reports that Mrs. Bruce has had signs of chronic fatigue since 1991 and then goes on to conduct an evaluation with respect to [the] condition of fibromyalgia. As the Retirement System is aware, chronic fatigue syndrome has been recognized by the Center for Disease Control and by the National Institute of Health. Unfortunately, the Retirement System has elected not to evaluate Mrs. Bruce for this disabling condition. Mrs. Bruce's own primary treating physician Dr. Calabrese with the Cleveland Clinic Foundation indicates a working diagnosis chronic fatigue syndrome as defined by the Center for Disease Control complicated by Neurogenic hypotension. Thus far, the Retirement System has elected not to evaluate Mrs. Bruce for this medical condition.

{¶ 73} "From the most recent communication from your office, it appears that the scope of additional evaluations is limited to the field of cardiology. Will Dr. Larry be conducting evaluations and examinations related to chronic fatigue syndrome? Does Dr. Larry have any particular knowledge or expertise with chronic fatigue syndrome?"

{¶ 74} 23. By letter dated November 19, 2001, STRS's general counsel advised relator's counsel:

{¶ 75} "* * * Dr. Larry was appointed due to his unique expertise in cardiac re-habilitation to clarify the limitations imposed by the neurogenic hypotensive complications of chronic fatigue syndrome reported by the attending physician. * * *

{¶ 76} "* * *

{¶ 77} "We most definitely disagree with the assertion in your letter that STRS has failed to adequately evaluate the condition that Mrs. Bruce alleges to be disabling. Identifying and evaluating the limitations imposed by her chronic fatigue syndrome are precisely what all of our examinations have attempted to do. The question is not whether or not a diagnosis has been made—whether the diagnosis is of chronic fatigue syndrome, heart disease, cancer or any other condition. The question is whether the functional limitations imposed by the condition prevent the performance of duty."

{¶ 78} 24. Dr. Larry examined relator on January 7, 2002, on behalf of STRS. Dr. Larry issued a report dated February 21, 2002, stating:

{¶ 79} "Review of her previous diagnostic studies include an abnormal tilt table study performed at the Cleveland Clinic. Her test was terminated because of vasovagal reaction to the head-up tilt test. Her maximum tilted blood pressure was 57/35.

{¶ 80} "The conclusion of the tilt table study was postural tachycardia with delayed postural diastolic hypotension followed by a vasovagal reaction. Repeat tilt table and blood volume study demonstrated abnormal venous pooling. It was felt her syncope was related to postural orthostatic tachycardia syndrome and abnormal venous pooling and she has been treated with beta-blocker therapy in addition to aggressive fluid and salt loading.

{¶ 81} "In summary, Mrs. Bruce exhibits chronic fatigue syndrome and has frequent episodes of syncope that have only been partially mitigated by the current medical therapy she is taking. Her syncope appears to be secondary to a combination of abnormal venous pooling and postural orthostatic tachycardia syndrome. Due to the combination of these two illnesses, it seems unlikely she is able to teach in a classroom for an eight hour day.

{¶ 82} "I recommended that she maintain close follow up with Dr. Fuad Farhat for ongoing management of her syncope. She has had a slight response to the therapy initiated thus far. She should be encouraged to participate in a rehabilitation program to assist with general reconditioning as a portion of her chronic fatigue may relate to deconditioning. She has been evaluated to initiate aquatic therapy and I have encouraged her to follow through with this."

{¶ 83} 25. On May 17, 2002, the STRB heard relator's appeal and voted to deny relator's application. STRB's written decision states:

{¶ 84} "Based upon a careful review of the entire record, the State Teachers Retirement Board makes the following findings and order:

{¶ 85} "Deborah S. Bruce was employed as a high school English teacher by the Stow–Munroe Falls City School District, beginning on a half-time basis during the 1994–95 school year. She worked full-time for 125 days during the 1995–96 school year; full-time during 1996–97; and was on maternity leave from that District during 1997–98 and 1998–99, resigning at the end of that school year. She indicated that her daughter was born in September 1997. On January 6, 2000, she applied for retirement benefits.

{¶ 86} "She submitted reports and information from her attending and consulting physicians, including tests and laboratory results. Her attending physicians are of the opinion that she is unable to perform her teaching duties due to chronic fatigue syndrome and fibromyalgia. The independent examiner appointed as required by section 3307.62 reported a diagnostic impression of fibromyalgia, but did not conclude that the condition prevents the performance of teaching duty

either upon examination in March 2000 or upon review in October 2000 and January 2001 of reports of further medical opinion and evaluation submitted by Ms. Bruce.

{¶ 87} "On March 26, 2001, the State Teachers Retirement Board acted to deny the application. Upon consideration of the information submitted by and on behalf of Ms. Bruce in the appeal of that denial, we concluded that further clarification of the neurogenic hypotensive complications of the chronic fatigue syndrome reported by the attending physician would be helpful to us in assessing her ability to function as [a] high school English teacher.

{¶ 88} "Accordingly, we appointed another independent examiner pursuant to section 3307.62 of the Revised Code and have received his report of examination conducted January 7, 2002. That report sets forth no remarkable findings upon examination, but upon review of the tilt table and blood volume studies conducted in January 2001 conducted at the request of the attending physicians concluded that it was unlikely that she has been able since date of those studies to teach in a classroom for an eight hour day due to fatigue and episodes of syncope. The examiner commented that a portion of her chronic fatigue may be related to deconditioning.

{¶ 89} "Section 3307.62 of the Revised Code requires that each applicant for ·disability benefits be examined by independent physicians appointed by this Board—physicians who are neither in a doctor/patient relationship with an applicant nor employed by the Retirement System. The statute provides that if such physicians conclude that an individual is incapacitated from teaching duty and if this Board concurs, disability benefits shall be granted. After a careful review of the entire record, we are unable to reach the conclusion that Ms. Bruce is unable to perform the duties she performed prior to her resignation from teaching.

{¶ 90} "While the second independent examiner reported essentially negative findings upon examination, he concluded on the basis of tests a year before that it was unlikely that she could teach in a classroom for an eight-hour day. However, nothing in the record before us indicates that Ms. Bruce has ever been in a teaching position that required her to be in the classroom for an eight-hour day. Indeed, nearly half of the teaching credit she has established [is] of either part-time service or service for periods of parental leave. We are unable to conclude that the record before us demonstrates she is incapable of returning to the teaching service she previously performed and, therefore, we affirm the action of March 26, 2001 denying the application."

{¶ 91} 26. On September 25, 2002, relator, Deborah S. Bruce, filed this mandamus action.

Conclusions of Law:

{¶ 92} Three issues are presented: (1) whether the STRB's written decision shows an abuse of discretion with respect to Dr. Larry's report, (2) whether STRS failed to have relator examined for her alleged chronic fatigue syndrome, and (3) whether STRS abused its discretion by failing to have relator evaluated by a psychiatrist.

{¶ 93} The magistrate finds: (1) the STRB's written decision does show an abuse of discretion with respect to Dr. Larry's report; (2) STRS failed to have relator examined for her alleged chronic fatigue syndrome; and (3) STRS did not abuse its discretion by failing to have relator evaluated by a psychiatrist.

{¶ 94} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

{¶ 95} The determination by STRB of whether a person is entitled to disability retirement benefits is reviewable in mandamus to correct an abuse of discretion. *State ex rel. Pipoly v. State Teachers Retirement Sys.*, 95 Ohio St.3d 327, 2002-Ohio-2219, 767 N.E.2d 719, at ¶ 14. The term "abuse of discretion" means an unreasonable, arbitrary or unconscionable decision. Id.

{¶ 96} In *Pipoly*, the court refused to extend the mandate of *State ex rel. Noll v. Indus. Comm.* (1991), 57 Ohio St.3d 203, 567 N.E.2d 245, to orders or decisions of the STRB granting or denying disability retirement benefits. Accordingly, the STRB has no clear legal duty cognizable in mandamus to specify the evidence it relied upon or to explain the reasoning for a decision granting or denying an application for retirement disability. *Pipoly*, supra, at ¶ 22.

{¶ 97} However, in this case, STRB has chosen to present the reasoning and evidence relied upon for its decision. Given that STRB has taken this voluntary step, its written decision is reviewable in mandamus to determine whether it shows an abuse of discretion.

{¶ 98} As previously noted, at the September 21, 2001 appeal hearing, STRB decided that an additional medical evaluation was needed "to clarify her cardiac status." Consequently, relator was scheduled by STRS for an examination by Dr. Larry. As STRB indicates in its May 17, 2002 written decision, Dr. Larry was appointed to examine relator for "further clarification of the neurogenic hypotensive complications" discussed by the attending physician, Dr. Calabrese, in his August 17, 2001 report.

{¶ 99} The STRB decision is written in such a way as to make it unclear whether STRB relied upon Dr. Larry's report as evidence supporting its decision or whether it rejected Dr. Larry's report and relied upon the reports of Dr. Wolfe.

■ {¶ 100} If STRB relied upon Dr. Larry's report as evidence to support its decision, then STRB abused its discretion by, in effect, rewriting Dr. Larry's disability opinion to mean something that is not stated or implied in his report. If, on the other hand, STRB rejected Dr. Larry's report and relied upon Dr. Wolfe's reports, the decision is an abuse of discretion because Dr. Wolfe presents no evidence regarding relator's cardiac status.

{¶ 101} Dr. Larry performed an examination of relator on January 7, 2002. In his report of February 21, 2002, Dr. Larry notes that relator has frequent episodes of syncope and that her syncope appears to be secondary to a combination of abnormal venous pooling and postural orthostatic tachycardia syndrome. He states that "due to the combination of these two illnesses, it seems unlikely she is able to teach in a classroom for an eight hour day." On an STRS form, Dr. Larry certified that, based upon his examination, it is his opinion that relator "is incapacitated for the performance of duty as a teacher" and "that the disability is considered to be permanent," and that "she should be retired."

{¶ 102} Significantly, the STRS form on which Dr. Larry opined that relator "is incapacitated for the performance of duty as a teacher" makes no distinction between full-time or part-time teaching duties. In short, without qualification, Dr. Larry certified on the STRS form that relator is incapacitated for the performance of duty as a teacher.

{¶ 103} It should be further noted that the record fails to disclose that STRS ever asked Dr. Larry to opine as to whether relator is incapacitated for the performance of part-time duty as a teacher.

{¶ 104} Given the above scenario, it is understandable that Dr. Larry would further opine in his narrative report that "it seems unlikely she is able to teach in a classroom for an eight hour day."

{¶ 105} There is no indication in the record whatsoever that Dr. Larry intended his certification or his narrative report to be construed as an opinion that relator *can* perform her duty as a teacher for something less than an eight hour day or even up to an eight hour day. Dr. Larry's statement that "it seems unlikely she is able to teach in a classroom for an eight hour day" is clearly consistent with his unqualified certification on the STRS form.

{¶ 106} Nevertheless, the STRB's written decision suggests that the STRB construed Dr. Larry's statement to mean that relator is *not* incapacitated for the performance of teaching duty as long as the duty is less than an eight hour day.

{¶ 107} If in fact STRB intended to rely upon Dr. Larry's report as evidence to support its decision, then it has managed to, in effect, rewrite Dr. Larry's conclusion in his narrative report as well as his unqualified certification on the STRS form to mean something that is not at all stated or implied. While STRB

has the discretion to weigh medical evidence and to accept or reject the medical evidence it weighs, it has no authority to rewrite medical evidence so that it says something that is not stated or implied.

{¶ 108} The STRB's decision further suggests that STRB felt that the critical issue before it was whether relator is incapacitated for something less than full-time teaching duty. STRB emphasized that relator worked part-time before beginning full-time employment and that she was on maternity leave after her full-time employment. If STRB truly felt that the issue before it was whether relator is incapacitated for part-time work or for something less than full-time work, the written decision presents no legal basis for establishing that as the issue.

{¶ 109} If in fact STRB intended to reject Dr. Larry's report on grounds that his opinion is literally tied to the presumably false notion that relator previously taught "in a classroom for an eight hour day," then the only other independent physician upon which STRB could have relied is Dr. Wolfe. However, if STRB relied exclusively upon Dr. Wolfe's reports to support its decision, then it has abused it discretion by failing to obtain evidence upon which it can rely that evaluates relator's cardiac status.

{¶ 110} STRB cannot, without at least some valid explanation in the record, determine that a fair review of the application calls for the appointment of an independent examiner to clarify relator's cardiac status, and then, when it is dissatisfied with the examiner's report, rely upon medical evidence it had previously found to be incomplete.

{¶ 111} The second issue centers upon relator's contention that Dr. Wolfe failed to evaluate relator for her alleged chronic fatigue syndrome. Relator points to the fact that in Dr. Wolfe's March 14, 2000 report, she never mentions "chronic fatigue syndrome." On the other hand, STRS here points to the fact that Dr. Wolfe makes several references in her report to relator's "fatigue." STRS argues that Dr. Wolfe's reference to "fatigue" indicates that she evaluated for "chronic fatigue syndrome."

{¶ 112} In the final paragraph of her March 14, 2000 report, Dr. Wolfe makes the following recommendation:

{¶ 113} "I do not believe that Mrs. Bruce's fibromyalgia is disabling for her job as an English and journalism teacher. I think she would have significantly less fatigue if she would sleep at night. No one has tried her on any of the tricyclic medications in the evenings that might allow her to sleep and would certainly decrease the frequency of her urinating."

{¶ 114} There is a distinction between "fatigue" as a symptom and "chronic fatigue syndrome." Taber's Cyclopedic Medical Dictionary (18 Ed.1997) 384,

defines "chronic fatigue syndrome" as follows: "A syndrome marked by incapacitating fatigue. The patient's symptoms may wax and wane, but are severely debilitating and may last for months or years."

{¶ 115} Under Taber's definition of "fatigue" it is stated:

{¶ 116} "Fatigue may be the result of excessive activity, which causes the accumulation of metabolic waste products such as lactic acid; malnutrition (deficiency of carbohydrates, proteins, minerals, or vitamins); circulatory disturbances such as heart disease or anemia, which interfere with the supply of oxygen and energy materials to tissues; respiratory disturbances, which interfere with the supply of oxygen to tissues; infectious diseases, which produce toxic products or alter body metabolism; endocrine disturbances such as occur in diabetes, hyperinsulinism, and menopause; psychogenic factors such as emotional conflicts, frustration, anxiety, neurosis, and boredom; or physical factors such as disability. Environmental noise and vibration contribute to the development of fatigue. * * *" Id. at 710.

{¶ 117} In her March 14, 2000 report, Dr. Wolfe seems to attribute relator's "fatigue" to lack of sleep due to frequency of urination. Thus, Dr. Wolfe refers to "fatigue" as a symptom of sleep deprivation.

{¶ 118} In the magistrate's view, it requires some speculation to conclude that Dr. Wolfe found that relator does not have chronic fatigue syndrome. While early in her report, Dr. Wolfe states that relator has had signs of "chronic fatigue since 1991," we do not know for sure whether Dr. Wolfe was aware that "chronic fatigue syndrome" was alleged as a basis for the application. We do not even know whether Dr. Wolfe believes that "chronic fatigue syndrome" can be a medical basis for disability.

{¶ 119} Certainly, it is conceivable that Dr. Wolfe ruled out "chronic fatigue syndrome" but failed to mention in her report that she had ruled it out. Certainly, if she had ruled it out, it would be appropriate for her to comment or opine on the causes of fatigue. Nevertheless, in the magistrate's view, the lack of clarity in the report leaves some doubt as to whether Dr. Wolfe fully considered relator's claim that she has chronic fatigue syndrome.

{¶ 120} Consequently, the magistrate concludes that STRB abused its discretion when it denied the application based upon Dr. Wolfe's report, which is less than clear that chronic fatigue syndrome had been evaluated.

{¶ 121} The third issue is whether STRS abused its discretion when it failed to have relator evaluated by a psychiatrist.

{¶ 122} On September 18, 2000, relator was evaluated, at her own request, by psychiatrist Dr. Hutzler. For his summary and recommendation, Dr. Hutzler wrote:

{¶ 123} "* * * After reviewing Mrs. Bruce's psychological history, it is my opinion that she is getting excellent treatment, is appropriately taking Effexor, and I can think of no other additional medication which would be of help to her. I encouraged her to continue in psychotherapy, which clearly has benefited her. I think she has actually made a quite good adjustment to a disabling illness. I would agree that *from a global medical standpoint she is disabled in her ability to teach.*" (Emphasis sic.)

{¶ 124} According to relator, her submission of Dr. Hutzler's September 18, 2000 report to STRS required STRS to appoint a competent disinterested psychiatrist pursuant to R.C. 3307.62(C) to determine whether relator is mentally incapacitated for the performance of duty as a teacher. The magistrate disagrees.

{¶ 125} R.C. 3307.62(C) states:

{¶ 126} "Medical examination of the member shall be conducted by a competent, disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition, either permanent or presumed to be permanent for twelve continuous months following the filing of an application. The disability must have occurred since last becoming a member, or it must have increased since last becoming a member to such an extent as to make the disability permanent or presumably permanent for twelve continuous months following the filing of an application."

{¶ 127} In her application filed January 6, 2000, relator indicated that her disability claim would be premised upon "chronic fatigue syndrome" and "fibromyalgia." That was the diagnoses listed by Dr. Taras on the "Report of Attending Physician." Also, Dr. Calabrese's December 5, 1999 report stated that he believed that relator suffered from "chronic fatigue syndrome complicated by fibromyalgia." Dr. Calabrese's report was also attached to the application. Significantly, for a "general summary of applicant's mental condition," Dr. Taras wrote "Pt [patient] was *not* found to have anxiety or depression." (Emphasis sic.)

{¶ 128} In the magistrate's view, STRS does have some discretion to expand the scope of the medical inquiry beyond the claim initially made in the application itself where the situation warrants an expanded medical inquiry. For instance, in this case, STRS determined that it needed to clarify relator's cardiac status even though the application itself did not specify a cardiac condition as a cause of incapacity. There is no contention here that STRS abused its discretion in expanding the inquiry into the cardiac area.

{¶ 129} Here, STRS apparently determined that a psychiatric examination was not warranted by Dr. Hutzler's September 18, 2000 report. While Dr. Hutzler opined that "from a global medical standpoint she is disabled in her ability to teach," he was apparently unwilling to opine that relator is incapacitated by a psychological disorder. He felt that she had made a "quite good adjustment" to a disabling illness.

{¶ 130} The magistrate finds that it was well within STRS's discretion to not appoint a psychiatrist pursuant to R.C. 3307.62(C) to examine relator.

{¶ 131} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent STRB to vacate its decision denying relator's application for disability retirement and, in a manner consistent with this magistrate's decision, enter a new decision that either grants or denies relator's application.

/s/ Kenneth W. Macke
KENNETH W. MACKE
MAGISTRATE