DECISION
{¶ 1} Relator, Sharon A. Morgan, commenced this original action in mandamus seeking an order compelling respondent, State Teachers Retirement Board of Ohio ("STRB"), to vacate its decision terminating her disability retirement benefit pursuant to R.C. 3307.64, and to enter a decision reinstating the disability retirement benefit. *Page 2 
 {¶ 2} Pursuant to Civ. R. 53 and Loc. R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate found that STRB abused its discretion when it relied on Dr. Wolfe's reports to terminate relator's disability retirement benefit. Essentially, the magistrate determined that because it is unclear whether Dr. Wolfe actually examined the relator for the conditions at issue, Dr. Wolfe's reports were not some evidence supporting the STRB's decision. Therefore, the magistrate has recommended that we issue a writ of mandamus vacating STRB's decision terminating relator's disability retirement benefit, and further ordering STRB to decide whether or not relator is entitled to a disability retirement benefit without considering Dr. Wolfe's reports.
 {¶ 3} STRB filed objections to the magistrate's decision arguing that the magistrate substituted his judgment for that of STRB in rejecting Dr. Wolfe's reports. Contrary to the magistrate's conclusion, STRB contends that Dr. Wolfe accepted that relator suffers from possible "fibromyalgia syndrome with chronic fatigue/versus somatoform disorder," but nevertheless, concluded that these conditions were not disabling in this case. Therefore, STRB argues that it did not abuse its discretion when it relied on Dr. Wolfe's reports in terminating relator's disability retirement benefit. We agree.
 {¶ 4} Essentially, we disagree with the magistrate's characterization of Dr. Wolfe's reports. There is no indication that Dr. Wolfe refused to examine relator for the conditions that allegedly caused the disability. Although Dr. Wolfe noted that the diagnosis of relator's conditions was based primarily on subjective symptoms, she *Page 3 
expressly acknowledged the conditions in her reports. Nevertheless, Dr. Wolfe concluded that, based on the objective findings, relator should be able to continue to work as a librarian. In essence, Dr. Wolfe simply did not believe that relator's subjective symptoms prevented relator from working as a librarian. Contrary to the magistrate's conclusions of law, we find that STRB did not abuse its discretion by relying on Dr. Wolfe's reports. Therefore, we sustain STRB's objection.
 {¶ 5} Relator also filed an objection to the magistrate's decision arguing that the magistrate should have reinstated her disability retirement benefit because without Dr. Wolfe's reports, there is no legal basis to terminate her retirement benefit. Because we have found that STRB did not abuse its discretion when it based its termination of relator's disability retirement benefit on Dr. Wolfe's reports, we overrule relator's objection.
 {¶ 6} Following an independent review of this matter, we adopt the magistrate's findings of fact as our own, but not the magistrate's conclusions of law. For the reasons discussed above, we deny the relator's request for a writ of mandamus.
Respondents' objections sustained; relator's objection overruled; andwrit of mandamus denied.
 SADLER and FRENCH, JJ., concur. *Page 4 APPENDIX A MAGISTRATE'S DECISION Rendered on January 25, 2008 IN MANDAMUS {¶ 7} In this original action, relator, Sharon A. Morgan, requests a writ of mandamus ordering respondent, State Teachers Retirement Board of Ohio ("STRB"), to vacate its decision terminating a disability retirement benefit pursuant to R.C. 3307.64 and to enter a decision reinstating the disability retirement benefit. *Page 5 
Findings of Fact: {¶ 8} 1. In December 1987, relator filed a disability retirement application with the State Teachers Retirement System of Ohio ("STRS"). Relator had been employed as a librarian by the North Ridgeville City Schools.
 {¶ 9} 2. Attending physician Thomas E. Williams, M.D., certified on an STRS form dated January 13, 1988, that relator was incapacitated for the performance of her duty. The STRS form asks the attending physician to list "Major Symptoms" and to give a "Diagnosis." For the former, Dr. Williams wrote:
 Periodic extreme fatigue, muscle aches spasms, lymph-adenopathy, recurrent low grade temperature elevation, headaches, lightheadedness, abdomenal [sic] discomfort due to flatulence and intermittent diarrhea, palpitations, and a periodic skin rash.
 {¶ 10} For the latter, Dr. Williams wrote: "Chronic Systemic Viral Syndrome."
 {¶ 11} Dr. Williams further indicated that relator's incapacity was not permanent, but that reasonable recovery may be expected within "12-36" months.
 {¶ 12} 3. Relator's application prompted STRS to have relator examined by Richard Graham, M.D., an infectious disease specialist. Following a February 25, 1988 examination, Dr. Graham wrote:
 [Patient] states she was well until 2/4 when she had a "flulike" illness (fever, myalgias, [lymphadenopathy], diarrhea)[.] She felt somewhat better after 2 ½ weeks but subsequently has continued to have intermittent severe fatigue as well as periodic rash, lymphadenopathy, + low grade fever. Symptoms tend to be worsened by exertion + stress.
 * * *
 EXAMINATIONS BY SYSTEMS:
 Shotty anterior cervical lymphadenopathy. Exam otherwise without significant abnormalities. *Page 6 
 * * *
 DIAGNOSIS AND SUMMARY OF PHYSICAL AND MENTAL CONDITIONS:
 Ms. Morgan, by history, meets the case definition of the chronic fatigue syndrome, as recently proposed (Holmes, GP, et al., Ann Intern Med 108: 387, 1988)[.] Although her EBV antibody profiles do not provide unequivocal evidence for ongoing viral activity, the above definition does not require this for the diagnosis.
 {¶ 13} 4. On an STRS form, Dr. Graham certified that relator is incapacitated for the performance of her duty and that the disability is considered to be permanent or presumed to be permanent (12 continuous months) and that she should be retired, adding in his own hand "until such time as substantial recovery has occurred."
 {¶ 14} 5. Relator's application also prompted STRS to have relator examined by John D. Condon, M.D., who specializes in internal medicine. Following a June 6, 1988 examination, Dr. Condon wrote:
 CHIEF COMPLAINTS AND HISTORY OF PRESENT ILLNESS:
 The patient is a 39-year-old white female who has had persistent fatigue, drowsiness and weakness for over 2 years.
 In 1/86 she had laryngitis, was treated with antibiotics and about 2 weeks later developed a severe flu-like syndrome. She was off work two weeks, returned for 1 ½ days and was so fatigued she could not work. She returned home for another 2 weeks.
 Following this she began to work a half day the rest of the school year.
 She has had multiple physical examinations and a multiplicity of lab studies, none of which have been diagnostic. She has had Epstein-Barr titers run and none of these have met the requirements of chronic Epstein-Barr disease. *Page 7 
 Her primary complaint is that of extreme fatigability. She sleeps 12-14 hours a day and if she has any physical activity whatsoever, she is tired and washed out after minimal activity.
 This past year she has been working every other day and spends the other days off sleeping or staying in bed. She does no cooking, no housework and despite her long periods of rest, she is fatigued most of the time. She has very severe headaches, occipital frontal in nature, primarily late in the day suggesting that they are primarily muscular tension headaches.
 She has some gastrointestinal upset with gas and distention and bloating but does not have any nausea. Her appetite is good. Bowels are extremely erratic from loose to hard stool, sometimes frequent loose stools. She has had no genitourinary symptoms.
 The patient has been on Pepcid to reduce the lympha-denopathy which occurs and the generaliz[ed] swelling and edema. It is interesting that she becomes puffy and swollen but does not gain or change weight. The Pepcid has been useful in reducing the lymph nodes which she has in her neck, axilla and groin.
 She has not had any cardiovascular symptoms except for the marked fatigue.
 SIGNIFICANT PAST MEDICAL, PERSONAL AND OCCUPATIONAL HISTORY:
 The patient has never had a serious illness. She had a T A, appendectomy and tubal ligation. No sequelae.
 She is a librarian in a middle school with over 1000 students. She handles media equipment and problems along with her duties of teaching and managing the library. It is a fairly active position and one that has caused extreme fatigue and tiredness in the past two years.
 DIAGNOSIS AND SUMMARY OF PHYSICAL AND MENTAL CONDITION: *Page 8 
 The patient has the history suggestive of a chronic fatigue syndrome, possibly related to a viral infection. She continues to have recurrent lymphadenopathy and recurrent episodes of febrile response with and without activity. While she does not have the positive titers for Epstein-Barr (this was obtained by material submitted from your office), her history is strongly suggestive as are the recurrent physical findings.
 The applicant appears chronically ill and fatigued but not depressed to a major degree, although she admits to periods of depression and despondency when she is unable to function.
 {¶ 15} 6. On an STRS form, Dr. Condon certified that relator is incapacitated for the performance of her duty and that the disability is considered permanent or presumed to be permanent (12 continuous months) and that she should be retired.
 {¶ 16} 7. Relator's application further prompted STRS to have relator examined by psychiatrist Jeffery C. Hutzler, M.D. Following an August 11, 1988 examination, Dr. Hutzler wrote:
 SUMMARY AND RECOMMENDATIONS: At the present time Mrs. Morgan does not present enough symptoms to make a diagnosis of a depressive episode, either a Major Depression or Dysthymic Disorder. Nonetheless[,] I suspect that she has been brought up in an extremely inhibited emotional environment, expresses no negative feelings, uses somatic symptoms to given vent to some of her feelings and this also causes changes in behavior from those around her. She seems to be lacking completely in insight to the psychodynamics of her own family or her own marriage.
 Nonetheless[,] I do not see enough evidence for a psychiatric condition that would be incapacitating to her and her ability to work as a Librarian. Therefore[,] I do not believe that she is disabled in her ability to work as a Librarian. If she shows increasing signs of depression[,] however, I suggest a referral to a psychiatrist for further evaluation.
 Of course, the problem here is whether or not the "chronic fatigue syndrome" or the Epstein-Barr Virus syndrome is an accepted clinical entity in this woman. This is a controversial *Page 9 
subject. Many of these people respond to antidepressant medication and psychotherapy as well as anything else.
 She does have some symptoms of panic, although these do not fulfill criteria for panic disorder at the present time. She also does not entirely fulfill criteria for a Dysthymic Disorder. Nonetheless[,] she may have her present symptoms as a result of an Atypical Depression. Either of these certainly may respond to activating antidepressants, particularly the monoamine oxidase inhibitors such as Nardil. Other anti-depressants which are more activating are desipramine and Vivactil. It may be that she would respond to these medications quite well and a therapeutic trial might be in order.
 {¶ 17} 8. On an STRS form, Dr. Hutzler certified that relator is not incapacitated for the performance of her duty, that the disability is not considered to be permanent or presumed to be permanent, and that she should not be retired.
 {¶ 18} 9. Pursuant to Ohio Adm. Code 3307:1-7-01, STRB designates a group of independent physicians to serve as a medical review board ("MRB") under the direction of a chair appointed by STRB. The MRB members may be asked in panels of three to review any application. The MRB chair serves as an advisor to STRB. Ohio Adm. Code 3307:1-7-01(A).
 {¶ 19} 10. Ernest L. Mazzaferri, M.D., John A. Prior, M.D., and George H. Lohrman, M.D., all MRB members, were designated by chairman Robert Atwell, M.D., as the panel to review relator's application.
 {¶ 20} 11. Each MRB panel member issued a written recommendation to chairman Atwell in early September 1988.
 {¶ 21} 12. On September 2, 1988, Dr. Mazzaferri wrote: "After review of these medical documents, I believe the claimant's condition is temporary and is not permanently *Page 10 
incapacitating for the performance of her duties as a school teacher and that she should not be retired on this basis."
 {¶ 22} 13. On September 6, 1988, Dr. Prior wrote: "Based upon the lack of specific evidence of Epstein-Barr infection, chronic, it would be my opinion that the claimant is not disabled for the performance of her specified duties as a librarian."
 {¶ 23} 14. On September 11, 1988, Dr. Lohrman wrote: "After careful review[,] I am unconvinced we have objective evidence she is permanently disabled. I suggest we review the case in our next special conference."
 {¶ 24} 15. On September 27, 1988, Dr. Mazzaferri wrote:
 At a special meeting of the Medical Review Board held on September 27, 1988[,] the disability application of the above named individual was discussed in detail. We concluded that the claimant's disability was not serious enough to warrant disability retirement. I concur with the opinion that the disability is not permanently incapacitating for the performance of the job in question, and that disability retirement should not be granted.
 {¶ 25} 16. On September 29, 1988, Dr. Prior wrote:
 A Special Conference of the Medical Review Board of the State Teachers Retirement System was held on 9-27-88, to consider the disability retirement claim of Sharon A. Morgan. Mrs. Morgan made a personal appearance before the Review Board, at which time she reported on the specifics of her disability as well as answering appropriate questions from the Medical Review Board. After full consideration, it was the medical opinion of the Review Board that the claimant was not disabled.
 {¶ 26} 17. On October 1, 1988, Dr. Lohrman wrote:
 Sharon Morgan made a personal appearance before the Medical Review Board and her case was reviewed. It was concluded that she is not permanently and totally disabled and should not be medically retired. I concur in this opinion. *Page 11 
 {¶ 27} 18. By letter dated October 3, 1988, Dr. Atwell informed STRB that the MRB recommends the application be denied.
 {¶ 28} 19. On October 20, 1988, relator and her attorney made a personal appearance before a "Disability Review Committee" ("committee"). The committee voted to recommend that the application be granted by STRB.
 {¶ 29} 20. Apparently, STRB thereafter accepted the recommendation of its committee and granted relator's application for disability retirement.
 {¶ 30} 21. In early May 2005, STRB requested that relator have her attending physician provide a report on an STRS form as to her current medical status.
 {¶ 31} 22. On May 4, 2005, attending physician Marie Kuchynski, M.D., who specializes in rheumatology, certified that relator is currently incapacitated for her duty. The STRS form asks the attending physician to list major signs and symptoms. In response, Dr. Kuchynski wrote: "fatigue, muscle pain in neck [and] shoulder, legs. Joint pain — shoulder, elbow, knee, swollen glands, low grade fever."
 {¶ 32} The STRS form also asks the attending physician to provide a "Diagnosis." In response, Dr. Kuchynski wrote: "Chronic fatigue syndrome / Fibro-myalgia."
 {¶ 33} 23. STRS requested that relator be examined by Claire V. Wolfe, M.D., who performed an examination on July 15, 2005. Thereafter, Dr. Wolfe issued a four-page typewritten report stating in its entirety:
 Sharon Morgan is a 56 year old woman who worked as a librarian with the North Ridgeville City Schools from 1972 until she last worked in November 1988. She has been on disability since that time because of chronic fatigue syndrome. The information sent to me from SERS [sic] included her evaluations, consultations and laboratory tests from 1987 and 1988. Even at that time, her Epstein-Barr virus titers were not very remarkable, her medical evidence for *Page 12 
severe lymphadenopathy and fevers was minimal, her exams objectively were normal and it would appear that she was granted disability on the opinion that her fatigue was overwhelming and could be due to chronic fatigue syndrome.
 Mrs. Morgan today brought with her lots of information and I have copied it all for you. Objectively[,] there was little sent to me except one sheet of paper from her current treating rheumatologist, Dr. Kuchynski, whose diagnoses were "chronic fatigue syndrome/fibromyalgia." Mrs. Morgan tells me today that she has been very involved in the CFIDS movement, has been on many programs with Dr. Calabrese of the Cleveland Clinic and is hoping to see him for evaluation of her own case in the future.
 Mrs. Morgan has never returned to teaching and has never returned to any other gainful employment since she has been on disability. She states that ever since she "got sick" in February 1986 with the "bad flu," she has never snapped back and has had this severe profound fatigue. Her second husband is 65 years old and is now retired. He does the laundry. She has a girlfriend who cleans for her and who drove her to her appointment today. She herself still complains of "profound exhaustion" and "lots of muscle aches and pains." She is able to take herself for massage therapy one time a week and she shops for food one day a week. She enjoys singing and tried to join a choir. That required her to go to choir practice once a week. However, after the one performance that she attended, she developed "excruciating pain" in her left arm diagnosed as tennis elbow because she had held up the song book for an hour. This occurred this past December, was treated with iontophoresis and has improved significantly unless she reaches suddenly with an extended elbow. She still has occasional numbness in her fourth and fifth digits which she dates to this attack.
 In 1998, she developed a left frozen shoulder and had arthroscopic surgery. She states that they took the edge off of her left acromion.
 I asked Mrs. Morgan what she did daily and she related the following: she goes to bed about 4:00 or 5:00 am. She finds this a good time to go to bed having gotten in this habit when her husband was working the late shift. She awakens around noon. She feeds her cats, takes her vitamin supplements (please see the enclosed huge list) and then makes lunch for herself and her husband. She goes through the mail, *Page 13 
watches Fox news and around 5:00 PM she does some flower gardening. She may also take pictures; she likes to take pictures of butterflies. About 7:00 PM she will call her mother since her father has been ill with heart problems. Her parents live about 15 minutes away and they visit her about once or twice a week. She makes dinner around 7:30 or 8:00 which usually consists of microwavable food or something that can be put together quickly. Then she and her husband watch a movie together, then the news and then she does the dishes. After that she may talk to her girlfriend.
 I asked Mrs. Morgan if she did any exercise and she stated that she does some stretching but that "aerobic exercise exasperates it." She then went on to tell me that the literature supported the fact that people with chronic fatigue were unable to do any aerobic exercise. She also noted that she has very tender lymph nodes and she takes Zantac for this because Zantac's secondary affect is on the lympho-kines.
 Mrs. Morgan notes that everything that she does affects her muscles and her massage therapist always knows when she has been over doing it. She believes that she still gets swelling in her abdomen and waist line as the day goes on which she believes is due to swelling in her lymph nodes. When she was working, she states that she would get golf ball sized lymph nodes in her groin that made her walk funny. Now, she just has this abdominal swelling that causes her to want to tear off her bra and panties by the end of the day. She did have an episode of ischemic colitis diagnosed in March of this year with a CAT scan and colonoscopy and those papers are enclosed for STRS. The colonoscopy physician told her that he felt that it would probably heal itself since it was only a short segment. She is due to have a repeat CAT scan. She was also sent after this episode to rule out any type of hypercoagulable state. She told me, and she wrote a note on the form that she filled out, that the oncology work-up was unremarkable and there was no evidence of hypercoagulation found. She is now holding off on her Naprolan except for perhaps once or twice a week since she had the colitis. Her only other prescriptive medication is her Zantac.
 Mrs. Morgan typed out a five page single spaced summary of her own assessment of her history and symptoms and I have enclosed those for you. Her other past medical history *Page 14 
and review of systems reveals trouble sleeping, (I find no evidence that she has ever been treated with anti-depressants), arrhythmia, mild osteopenia, fever, chills, blurred vision, palpations, dry skin and easy bruising. Since her first exam for STRS, in addition to her shoulder arthroscopy she has had some breast biopsies that have been benign.
 On physical examination today, Sharon Morgan was a 5'4-1/2" 128 pound woman with a blood pressure of 120/80. She smelled like cigarette smoke and when I mentioned this to her-since she does not smoke-she stated that her husband did. She was pleasant, smiled appropriately and had no evidence of severe anxiety or depression. She was able to get up easily from the chair and move around the examining room.
 Her reflexes today were 4+ and symmetrical in both upper and lower limbs and she frequently jumped whenever I tapped her. I asked if I was hurting her and she stated I was not, that she was just apprehensive. She pointed out to me extreme tenderness along her right lateral thigh, her "fascia lata," and states that this "must be lymph nodes because it hurts to touch." I pointed out to her that there were no lymph nodes along the fascia lata and that the tenderness was most likely just from her muscles and tendons.
 Manual muscle testing in all four limbs was normal with give away primarily on testing the left shoulder external rotators. When I asked her why she could not give me resistance for this, she stated that it hurt her left forearm. However, she did not have left forearm pain with resisted wrist extension even with the elbow fully extended in the pronated position. She also did not complain of forearm pain with forced grip.
 There were no areas of atrophy in the median or ulnar hand intrinsics and she had no asymmetry of her arms, forearms or legs. Her calf circumferences were equal on specific measurements. She had excellent bulk in the extensor brevus bilaterally. She had full pulses in both feet and vibratory sensation was intact. There was full motion of all peripheral joints with no evidence of any synovitis, effusions or warmth.
 Cervical range of motion showed restricted flexion so that her chin lacked two finger breaths of touching her chest. She had full extension with just some crackling sensations. Her *Page 15 
right lateral rotation to 60° was limited by complaints of left trapezius pain. She had a little less rotation to the left but stated that it was actually less painful. Her low back range of motion was full. On right lateral bending she complained of some pain into her right sacroiliac joint but she had good segmental motion. She did not have any referred discomfort with any other back motions. Her straight leg raising was unremarkable in the seated position to 80° .
 I could not appreciate any lymphadenopathy today. I checked her in her supraclavicular area, her anterior and posterior cervical chains and her groin. I could not palpate abnormalities in her elbows nor behind her knees in the popliteal fossa although she was incredibly hypersensitive on palpating her popliteal fossa. Checking for tender points I found them in the anterior chest wall bilaterally, the lateral epicondyle bilaterally, the cervical paraspinals, upper traps, levators and mid scapula paraspinals, both buttock and over the greater trochanters and along the lateral leg particularly on the right. She had some mild tenderness in her right medial knee but not in her left.
 Impression: Possible fibromyalgia syndrome with chronic fatigue/versus somatoform disorder.
 Discussion: Mrs. Morgan has never had any significant elevations of her Epstein-Barr titer, itself remarkable since 80% of the adult population has elevated titers. I find that her subjective symptoms far outweigh anything objective. I find that she is totally invested in her diagnosis and the presumed disability and restricted activities that it imposes upon her. I do not find anything on today's examination of an objective nature that would, in my opinion, precluded her from her previous job as a librarian or any teaching activities.
 {¶ 34} 24. On an STRS form, Dr. Wolfe certified that relator is capable of resuming regular full-time service similar to that from which she retired and that disability benefits should not be continued.
 {¶ 35} 25. Dr. Hutzler, Charles F. Wooley, M.D., and Edwin H. Season, M.D., all MRB members, were designated as the panel to make a recommendation as to whether *Page 16 
relator's disability benefits should be terminated. Each panel member recommended in writing that disability benefits be terminated.
 {¶ 36} 26. By letter dated October 18, 2005, MRB chair Earl N. Metz, M.D., informed STRB: "The Medical Review Board concurs with the opinion of the appointed examiner and recommends that disability benefits be terminated."
 {¶ 37} 27. In response, relator submitted to STRS a report, dated August 17, 2005, from Leonard H. Calabrese, D.O., whose letterhead indicates that he is "Vice Chairman[,] Head, Section of Clinical Immunology" at the Cleveland Clinic Foundation. In his report to Dr. Kuchynski, Dr. Calabrese states:
 56 yo woman with CFS and FMS for 17 years
 Still highly symptomatic — reviewed narrative — barely able to do self care. CC Fatgue [sic]; Pain; Cognitive
 Fatigue
 Highly disturbed sleep; awakens every 2 hrs with pain; awakens unrefreshed; has sevre [sic] post exertional fatigue; tried many strategies for graded exercise without success; mostly limited by pains
 Pains
 Wide spread; severe soft tissue pains; has used naprosyn with some success but concerned over lower bowel complications;
 Pains are severe — worst areas neck and shoulder; getting massotherapy weekly; see FMS impact
 New pains in sacral area
 Cognitive
 Over years getting worse; though she is a librarian can not read books!! see narrative
 Disability index 30% *Page 17 
 * * *
 Impression
 Severe CFS and FMS of 17 years duration. Disability Index 30% and consistent with total disability. No obvious psychologic co-factors
 {¶ 38} In his August 17, 2005 report to Dr. Kuchynski, Dr. Calabrese included the following general medical information:
 Chronic fatigue syndrome or CFS is a complex disorder of unknown etiology characterized by chronic fatigability of greater than 6 months duration associated with non-restorative sleep, frequent memory and concentration problems, frequent sore throats, tender glands, diffuse musculoskeletal aching and headaches. Virtually all patients with chronic fatigue notice that their symptoms are made worse with only minor exertion. This is called post-exertional fatigue.
 Three quarters of patients with chronic fatigue syndrome have an associated conditions called fibromyalgia syndrome or FMS. This is a chronic, painful, but benign musculoskeletal condition whose symptoms consist of diffuse aching or burning from "head to toe". Other associated signs or symptoms seen in people with CFS or FMS include musculoskeletal stiffness, increased head aches or facial pain, sleep disturbances, gastrointestinal complaints such as irritable bowel syndrome, urinary bladder symptoms such as urgency or frequency in the absence of a bladder infection and paresthesias or a feeling of numbness or tingling in the extremities. Not al[l] patients have the same degree or types of symptoms.
 Other complaints include intermittent chest heaviness or tightness that is not related to exertion, nagging skin complaints such as itching, dryness or blotchiness, a feeling of disequilibrium or wooziness and a sensation of "restless legs". Three-quarters of patients with either of these conditions have a history of either past or current depression, anxiety or panic. The relationship between mood problems and fatigue and pain is complex and is probably neither simple cause or effect. Even when a patient believes that they are depressed only because they feel so bad is an *Page 18 
indication for aggressive treatment of the associated mood abnormality.
 There is no simple cure for chronic fatigue syndrome or fibromyalgia, but the encouraging news is that the symptoms are for the most part reversible. The sobering reality is that there is no quick fix. Furthermore[,] all patients with CFS/FMS must remember that their symptoms are real, not in their head and not their fault. After this step, then improvement can be seen.
 The cornerstones of therapy for CFS and/or FMS, which have been proven by experimental studies, include graded low intensity exercise and cognitive behavioral therapy or CBT, which allows patients to better adapt to their symptomatology and ultimately overcome it. The exercise program needs to be done daily and need not be excessive in terms of intensity. Dietary maneuvers, which employ a diet which is healthy both for the heart as well as the immune system, are important. The use of balanced supplements with antioxidant properties may also be of benefit.
 A number of medications have been used including the empiric use of anti-depressants (even in those who are not depressed) which may alter the chemical milieu of the central nervous system to minimize pain and fatigue and improve memory and concentration. Non-narcotic analgesics are often used to relieve some of the pain and a variety of medications may be used for sleep correction. Experimental therapies including stimulants may be used in a subset of patients. There are natural remedies including herbs and supplements that have some role to play, but these need to be tailored to the individual.
 {¶ 39} 28. In a separate report dated October 24, 2005, Dr. Calabrese stated:
 I reviewed the materials you sent me on the disposition of Sharon Morgan, who as you know, has been seen at the Cleveland Clinic for chronic fatigue syndrome. Unfortunately, the index symptoms of chronic fatigue are those of fatigue and pain that cannot be objectively quantified. I know of no criteria that mandates objectification in terms of disability. Thus, we have used subjective measures measured over time which I believe creates a reliable index to judge the patient's capacity to work. We have been following this patient here for many years. *Page 19 
 I would like to state at this juncture that I rarely support disability in patients with CFS, a condition I have been seeing [in] patients for over 15 years. However, with such a long track record and with symptoms being so consistent, indeed limited by pain and fatigue, I think the prognosis for return to gainful employment is extremely low.
 {¶ 40} 29. Relator also submitted to STRS an additional report from Dr. Kuchynski dated December 28, 2005, stating:
 Ms. Morgan has been a patient of mine since 1995. She began to have overwhelming fatigue, muscle and joint aches, lymphadenopathy and low grade fevers in 1985. She was diagnosed with CFS in 1987 by Dr. Richard Graham, an infectious disease specialist at University Hospitals of Cleveland. I personally know Dr. Graham and he is very respected in his field and at the time of her diagnosis, Dr. Graham was considered the expert on CFS at University Hospitals of Cleveland. Therefore, when I met Ms. Morgan in 1995, I had no reason whatsoever to doubt the clinical diagnosis since I knew from experience that she had seen who I felt was a leader in this field in the Northeast Ohio area. She has been disabled by her disease for 17 years. Despite therapy, she continues to have episodic severe fatigue. Exertion for just the simple activities of daily living have, per her history, can cause these bouts. Along with the fatigue, she has non-restorative sleep (i.e., when she wakes up in the morning, she still feels tired). The fatigue coupled with the non-restorative sleep lead to cognitive dysfunction — mainly trouble with concentration, diminished ability to focus on tasks, difficulty with higher cognitive functions (like math). What may take you and me a very short period of time to master a task, could take hours or even days for a patient like Ms. Morgan purely because of the cognitive dysfunction. Couple this with the fact that she continues to have muscle and joint pain, it would be very difficult for her to maintain a job that is either physical in nature or requires higher cognitive tasks. I think you would agree that a job as a librarian involves not only the lifting of books but also the ability to think clearly in assisting clients in the library. *Page 20 
 {¶ 41} 30. On January 9, 2006, Dr. Wolfe wrote to Dr. Metz as follows:
 * * * [I] have, as you requested, reviewed additional material from Doctors Leonard Calabrese and Marie Kuchynski from the Cleveland Clinic.
 I do not disagree with any of Doctor Calabrese's findings. As he notes, however, there are no objective abnormalities for the chronic fatigue or fibromyalgia and the inability to work and the disability from the symptoms are determined on a subjective basis. He notes that Ms. Morgan has had these symptoms for years, has become progressively more disabled by them but has had no change in her objective status.
 Additional information would, therefore, not change my opinion that, based on objective abnormalities, Sharon Morgan should be able to continue in her job as a librarian.
 {¶ 42} 31. On March 8, 2006, relator appeared personally before the committee. Relator also submitted a lengthy written statement to the committee.
 {¶ 43} 32. On March 10, 2006, STRB terminated relator's disability benefits effective August 31, 2006. By letter dated March 14, 2006, STRS informed relator of her right to appeal the STRB decision.
 {¶ 44} 33. Relator timely filed an appeal of the STRB decision.
 {¶ 45} 34. In support of her appeal, relator submitted another letter or report from Dr. Kuchynski dated July 17, 2006. The report stated: "Since my last report, Ms. Morgan has undergone a series of tests to evaluate the extent of her cognitive dysfunction."
 {¶ 46} 35. In further support of her appeal, relator submitted a report dated July 28, 2006, from Sheila Paul, D.O., stating:
 Mrs. Morgan took the neurocognitive evaluation that I use from the CNSVS company. The results are attached. The test is not an IQ test but rather is a good test for attention and focus which are functions specific to the frontal lobes and visual and verbal short term memory. The controls used *Page 21 
for this test are age matched to the pt. and the score is given relative to the patients same age cohort group. Surprisingly, Mrs. Morgan preformed [sic] extremely poorly on this exam. She was in the very low percentile compared to others in her age cohort. This is surprising because given her previous education level and functioning level it is hard to believe that she would do as poorly as she did. In fact most adult patients that I have tested with similar results usually had an underlying development delays or have mild to moderate mental retardation. This drop in her cognition was definitely significant and would obviously cause disability in her potential work environment. I am not an expert in Chronic Fatigue Disorder but from my understanding of the studies done on people with Chronic Fatigue Disorder that the cognitive decline seen in these patients is much less * * * dramatic and the changes are missed often because they are so subtle.
 Again[,] because of the severity of the results in comparison to what I would except her baseline to be given her work and education history[,] I felt she needed more follow-up. I had her repeat an MRI of the head which has been completed and the results came back completely normal with no lesions or bleeds. At this point[,] I can state that based on the results of the testing she completed in my office that she has some very significant cognitive deficits in her memory and attention mostly the area affected by the frontal lobes of the brain. Her results are out of the norm and do raise clinical suspicion of a stroke or space occupying lesion or head trauma that could cause such significant changes from what I assume to be her baseline cognition. Though this recent [MRI] is negative I would still recommend she have neurological assessment. If she is truly functioning at the level reflected in the results of this testing she would definitely be adversely affected in the workplace being a librarian. * * *
 {¶ 47} 36. In a letter dated August 16, 2006, relator's counsel wrote to STRS:
 The test results included herein confirm that she has a severe impairment which would prevent her from functioning in her capacity as a librarian. This objective symptom of diminished cognitive functioning represents the only symptom that Ms. Morgan could have "objectively" affirmed.
 Again, even though there is no requirement for objective symptoms as far as disability retirement, or the continuation *Page 22 
of disability retirement benefits, Ms. Morgan has obtained and is providing these test results as objective evidence of her disabling symptoms which, as Dr. Kuchynski indicates in her report, relate to her chronic fatigue syndrome.
 {¶ 48} 37. Apparently, relator's submission of Dr. Paul's report prompted STRS to have relator examined by Robert A. Bornstein, Ph.D., who specializes in neuro-psychology. In his report dated November 22, 2006, Dr. Bornstein stated:
 These results indicate that she is functioning within normal limits in most areas of higher cognitive function. Her performance on measures of general ability, learning and memory, concept formation, and simultaneous sequencing are all well within normal limits. There were some scattered relative weaknesses on measures of complex abstract reasoning and psychomotor problem-solving, but the vast majority of her performance is above average, and entirely within normal limits. There is no evidence of cerebral dysfunction. Furthermore, her performance on objective measures of cognitive ability are normal, and inconsistent with her subjective report of problems with memory and concentration. The examination required a full day of sustained cognitive effort, and there was no indication of any deterioration of her level of performance throughout the examination. She indicated that following a day of sustained effort, she would likely be wiped out for several days. There were some indications on the personality assessment of an excessive level of concern over her health, and a tendency to focus on physical symptoms as a means of coping with or avoiding stress. From a neuropsychological perspective, there is no objective evidence of cognitive impairment that would interfere with her ability to perform her normal vocational duties. She does appear to be psychologically invested in her condition which may represent a barrier to her vocational activities. I am unable to assess the objective extent of her somatic symptoms. It is unclear whether she has been treated with medications such as Modafinil, that have been developed to treat fatigue.
 {¶ 49} 38. On January 18, 2007, relator personally appeared before the STRB in support of her appeal. Her testimony was recorded and transcribed for the record. *Page 23 
 {¶ 50} 39. On January 18, 2007, following the appeal hearing, STRB decided to terminate relator's disability retirement benefits.
 {¶ 51} 40. On February 12, 2007, relator, Sharon A. Morgan, filed this mandamus action.
Conclusions of Laws: {¶ 52} The issue is whether STRB can rely upon Dr. Wolfe's reports to support its decision to terminate relator's disability retirement benefit.
 {¶ 53} Finding that STRB cannot rely upon Dr. Wolfe's reports, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 54} Because STRB's final decision to terminate relator's disability retirement benefit is not appealable, mandamus is available to correct an abuse of discretion by STRB in its determination concerning disability retirement benefits. State ex rel. Hulls v. State TeachersRetirement Bd. of Ohio, 113 Ohio St.3d 438, 2007-Ohio-2337, at ¶ 27, citing State ex rel. Pipoly v. State Teachers Retirement Sys.,95 Ohio St.3d 327, 2002-Ohio-2219.
 {¶ 55} Even though the STRB's final decision is reviewable in mandamus, STRB is not required to comply with State ex rel. Noll v.Indus. Comm. (1991), 57 Ohio St.3d 203, when it issues orders or decisions granting or denying disability retirement benefits.Pipoly at 330-332. Accordingly, STRB has no clear legal duty cognizable in mandamus to specify what evidence it relied upon and explain the reasoning for its decision terminating relator's disability retirement benefits. Id.
 {¶ 56} R.C. 3307.64 states: *Page 24 
 The state teachers retirement board shall require any disability benefit recipient to submit to an annual medical examination by a physician selected by the board * * *
 After the examination, the examiner shall report and certify to the board whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled. If the board concurs in a report by the examining physician that the disability benefit recipient is no longer incapable, the payment of a disability benefit shall be terminated * * *.
 {¶ 57} R.C. 3307.62(C) states:
 Medical examination of the member shall be conducted by a competent, disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition, either permanent or presumed to be permanent for twelve continuous months following the filing of an application. * * *
 {¶ 58} STRB's reliance upon Dr. Wolfe's report is abundantly clear from the record before this court. Moreover, respondent does not dispute its reliance upon Dr. Wolfe's reports which relator challenges here. STRB's reliance upon a medical report that is unclear as to whether the physician has actually examined for the condition at issue is grounds for the issuance of a writ of mandamus. State ex rel. Bruce v. StateTeachers Retirement Bd. of Ohio, 153 Ohio App.3d 589, 606-607,2003-Ohio-4181, at ¶ 113-122.
 {¶ 59} Analysis begins with a review of Dr. Calabrese's August 17 and October 24, 2005 reports which Dr. Wolfe presumably referenced in her January 9, 2006 report.
 {¶ 60} In his August 17, 2005 report, Dr. Calabrese concludes (his impression) that relator has had severe chronic fatigue syndrome and fibromyalgia syndrome for 17 years and that her current "disability index" is at 30 percent which is consistent with total disability. Earlier in his August 17, 2005 report, during what appears to be the history- *Page 25 
taking portion of his evaluation, Dr. Calabrese states that relator reported "highly disturbed sleep" and "severe post exertional fatigue." Dr. Calabrese describes relator's pain as "wide spread" and "severe" with the worst areas at her neck and shoulder. He describes her cognitive status as "over years getting worse."
 {¶ 61} Attached to Dr. Calabrese's August 17, 2005 report is a "Chronic Fatigue Immune Dysfunction Syndrome Disability Scale" ("CFIDS disability scale"). At the 30 percent mark, the scale states: "Moderate to severe symptoms at rest. Severe symptoms with any exercise, overall activity level reduced to 50% of expected. Usually confined to house. Unable to perform any strenuous tasks. Able to perform desk work 2-3 hours a day, but requires rest periods."
 {¶ 62} Presumably, when Dr. Calabrese states that relator's disability index is at 30 percent he his referring to the CFIDS disability scale attached to his August 17, 2005 report.
 {¶ 63} In his October 24, 2005 report, Dr. Calabrese states that relator has been seen at the Cleveland Clinic for chronic fatigue syndrome and that, unfortunately, the index symptoms of chronic fatigue are those of fatigue and pain that cannot be objectively quantified. He states that he has used "subjective measures" measured over time which he believes creates a reliable index to judge capacity for work. Dr. Calabrese concludes that relator's "prognosis for return to gainful employment is extremely low."
 {¶ 64} In her January 9, 2006 report, Dr. Wolfe states: "I do not disagree with any of Doctor Calabrese's findings." It is not exactly clear to this magistrate what Dr. Wolfe means by this statement. *Page 26 
 {¶ 65} While it can be said that Dr. Calabrese found relator to be at a disability index of 30 percent which is consistent with total disability, presumably, Dr. Wolfe did not mean to say that she agreed with Dr. Calabrese's ultimate conclusion regarding the extent of relator's disability. Given this presumption, the question remains — with what findings of Dr. Calabrese does Dr. Wofle agree?
 {¶ 66} Because Dr. Calabrese states that it is the subjective symptoms measured over time that is the basis of his disability conclusion, presumably, it is with those subjective findings that Dr. Wolfe agrees when she states: "I do not disagree with any of Doctor Calabrese's findings."
 {¶ 67} In her January 9, 2006 report, Dr. Wolfe goes on to say that "there are no objective abnormalities for the chronic fatigue or fibromyalgia and the inability to work and the disability from the symptoms are determined on a subjective basis." Apparently, Dr. Calabrese would agree with Dr. Wolfe's statement as just quoted.
 {¶ 68} In the final paragraph of her January 9, 2006 report, Dr. Wolfe states: "Additional information would, therefore, not change my opinion that, based on objective abnormalities, Sharon Morgan should be able to continue in her job as a librarian."
 {¶ 69} Thus, Dr. Wolfe strongly suggests that she views Dr. Calabrese's subjective findings that he used to support his disability opinion, as being irrelevant or immaterial to her evaluation of relator's disability. Thus, Dr. Wolfe apparently concludes that the lack of "objective abnormalities" is determinative of the disability question.
 {¶ 70} The question here is, given her apparent refusal to evaluate the reported or observed subjective symptoms, whether Dr. Wolfe has truly evaluated relator for chronic fatigue syndrome and fibromyalgia. *Page 27 
 {¶ 71} Despite the length of her January 25, 2005 report and her detailed discussion of relator's daily activities, Dr. Wolfe never presents or discusses the medically accepted criteria for rendering a diagnosis of chronic fatigue syndrome. The failure to address criteria and the failure to indicate acceptance of criteria for chronic fatigue syndrome strongly suggests that Dr. Wolfe does not recognize chronic fatigue syndrome as a legitimate medical condition that can become the basis for disability.
 {¶ 72} Apparently, chronic fatigue syndrome and fibromyalgia share a history of controversy in the medical literature that the parties have submitted to the STRB record in this case. Parenthetically, Dr. Hutzler recognized chronic fatigue syndrome as a "controversial subject" in his August 11, 1988 report to STRB. Notwithstanding the controversy over those claimed conditions, it is clear that Dr. Calabrese accepts chronic fatigue syndrome and fibromyalgia as legitimate medical disorders while Dr. Wolfe strongly suggests that she does not.
 {¶ 73} In the magistrate's view, it is not the duty of this court in this action to determine whether STRB can terminate a disability retirement benefit on grounds that the claimed disabling medical conditions do not constitute legitimate medical disorders. However, if that is truly its determination — that such claimed medical disorders are not legitimate — such determination must, at a minimum, be supported by evidence in the record. Clearly, in this record, there is no evidence that chronic fatigue syndrome and fibromyalgia are not legitimate medical disorders that can be the basis for a disability retirement, other than Dr. Wolfe's suggestion that such is the case.
 {¶ 74} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent to vacate its decision terminating relator's disability *Page 28 
retirement benefit, to eliminate the reports of Dr. Wolfe from further consideration and, in a manner consistent with this magistrate's decision, enter a new decision as to whether relator's disability retirement benefit shall be terminated or reinstated. *Page 1